## Norris *against* Hamilton.

The actual survey, designated by lines marked upon the ground, is the true survey, and will not be affected by any subsequent measurement, based upon the survey as returned into the surveyor-general's office.

If a survey has been returned for more than twenty-one years, it must be presumed to have been rightly made : the records of the land office must furnish the best evidence of what was done by those who are not now living, to give evidence on the subject.

ERROR to the common pleas of *Clearfield* county.

This was an action of ejectment by Elizabeth Hamilton against Moses Norris, for a tract of land in Clearfield county.

The plaintiff claims under a warrant in the name of Alexander Reed, which is one of twenty-one descriptive warrants, bearing date the 8th of July 1784, on which surveys were made in the months of June and July 1785. They were all returned and accepted on the 1st of October 1785. All the land around them was vacant. It is said they belonged to John Nicholson. He sold them on the 10th of March 1795, to John Ashly, who obtained a patent in 1800. In 1831, Ashly sold to James Hamilton, the husband of the plaintiff, who devised them to her.

These surveys were not fully marked on the ground, but enough appeared to show that surveys were made ; that the lines of the leading warrants were run, and that there was a traverse of the creek. Of this body of surveys, the south west line is the one on which the dispute arises. That line runs from the bank of the Clearfield creek. The line is common to twelve surveys. An ash was marked, as a corner, in 1785. All the return drafts call for a line running from the ash south, sixty degrees west. That line was run in 1792, on the ground, and marked the course the return drafts called for from the ash. At that time all the land on the right of that line was vacant. The line on the ground is according to the return drafts in the land office. All the corners on the ground are preserved by that line, and the shape and form of the original surveys, as returned, are preserved.

The defendant's right is of a later date. The Messrs Martins, on the 4th of February 1793, took out several descriptive warrants. The leading warrant calls for Thomas Jordan and Ann Jordan, two of the tracts under which the plaintiff claims. They purport to be surveyed on the 20th of October 1794. They were returned on the 29th of April 1795. This body of surveys was also badly executed on the ground, and they were laid so as to interfere with the older rights. John Nicholson also became the owner of this body of surveys ; his right was sold by the commonwealth in 1808, to John Norris, the father of the defendant, for the consideration of 26 dollars

[Norris v. Hamilton.]

and 70 cents. The defendant took possession in 1811, in the latter end of April or beginning of May. Hamilton, the plaintiff, bought the survey in the name of Alexander Reed, and the defendant bought the survey in the name of Richard Martin; and the question is one of boundary between the parties.

The plaintiff's statement set out her claim to be fifty acres of land, be the same more or less, in Lawrence township, Clearfield county, being part of a larger tract of land containing two hundred and eighty-five acres, and one hundred and twelve perches, surveyed to Alexander Reed, in pursuance of a warrant dated the 8th of July 1784, bounded by the lands of J. Thompson and others. The defendant pleaded not guilty. Issue.

Exception was taken to the following directions given to the jury, by the court below.

Burnside, president.—"The law is, and it will perhaps govern this case, that where lines and corners are to be found on the ground, they cannot be departed from, though there may be some variance in the courses; and if the waters are found to agree with the lines and courses returned, this is strong evidence of a survey actually made. The line of 1792 was run and marked on the ground in 1792, before the defendant's title was thought of, when all on the right of that line was vacant. It was run according to the returns in the office. It was made. It was run forty-four years ago. It is a line of twelve surveys, according to their returns in the land office. Why then should it be changed? Why should these twelve surveys be thrown out of shape, and why should later warrants and surveys alter and change that line? That line is an ancient boundary. It was the first boundary made on that ground; and in the judgment of the court, it is entitled to great consideration and regard.

"The argument of the defendant is that the plaintiff has too much land, and that some of the interior lines of the plaintiff's tracts are too long. There is but little in this. The lines on the ground are the true survey. The courses and distances are only evidence of the survey. If the lines had been too short, the plaintiff could not have made them longer. If they are longer than they should be, where the courses and distances are preserved, they are entitled to hold the surplus."

The jury rendered a verdict for the plaintiff. The defendant's counsel moved in arrest of judgment, on the ground of the uncertain description contained in the plaintiff's statement. But the court overruled the motion, and entered judgment on the verdict.

*Wallace*, for plaintiff in error.
*Potts*, for defendant in error.

The opinion of the Court was delivered by

Huston, J.—This case is brought into this court to ascertain whether certain decisions made thirty or forty years ago, and affirmed

[Norris v. Hamilton.]

once every three or four years since, are still the law of the land; or whether they were originally so contrary to law and public policy, and palpable justice, that they ought now to be changed, and the rules which had been supposed to have settled the rights to very much of the land in Pennsylvania, are to be revised, corrected and changed, at the risk of unsettling all titles to land. After I came to the bar, something more than forty years ago, for many years I resided in a section of the state where titles to land were much disputed. The judges of the supreme court held every year, or oftener, courts of *nisi prius* in those counties. Afterwards, by a slight modification, the name was changed to circuit court, which continued until 1809. The first chief justice was M'Kean; in 1799 Shippen, and in 1806, Tilghman : the associates, Yeates, T. Smith, and, on his decease, Brackenridge. M'Kean, Shippen and Yeates had been at the bar, or on the judicial bench, from 1760, or before that time. Shippen had been one of the commissioners of property, under the proprietors, from 1754, and, as such, superintending the land office until the revolution. Smith and Brackenridge had come to the bar at the close of, or during the war of the revolution. All those named were distinguished for legal learning in general ; for great industry and decision of character ; and most of them made and preserved notes of the points made and decided at every trial at which they respectively presided. Being members of the same supreme court to which appeals from the decision of any one would be had, they were enabled to form a system uniform throughout the state ; and they did form it. It was the result, not of abstract theory, but practice, and combined, in no ordinary degree, private justice with general security of titles. It met general, I might say, universal approbation. The matters then often discussed, and most frequently decided, were some of those which are brought up in this case, viz., What would be the effect of a defective or inaccurate survey ; the necessity of a survey ; or what should be proof presumptive or conclusive of a survey ?

In disposing of a wilderness so extensive as Pennsylvania was, it was necessary, on the arrival of the first settlers, that each should have a part allotted to himself, and that this should be separated from the other land ; and this was done by running lines with a compass, and designating their course, measuring the length of the several lines, and noting them ; and at the same time a person followed the surveyor, and with an axe cut off a slice of the bark of such trees as stood in the line, or close to it; and the ends of the line, or corners, were designated by notches cut into the trees. The surveyor, after this, made a plot or draft of the land surveyed; made a calculation of the quantity of the land contained in the survey; and returned a fair copy of the draft, and a certificate of the quantity and time when surveyed, into the office of the surveyor-general, and this was filed and preserved : and a copy under the seal of that office, is evidence in all cases, *prima facie*, that the survey was made as repre-

VII.—I

[Norris v. Hamilton.]

sented. It would never have been possible to get along with this system, if every person had been allowed to survey and return surveys. An officer, called the deputy surveyor, was appointed and sworn, and gave bond for the faithful discharge of his duty. The districts allotted to these deputy surveyors, often included very large tracts of country, and much of the actual surveying was done by the assistants, whom they appointed. Inaccuracies in surveys occurred, as might have been expected, and complaints were made in the lifetime of the first proprietor by him and by the people, and more than one provincial legislature passed laws for re-surveys, on account of inaccuracy as to quantity. These laws were uniformly repealed by the king and counsel, and wisely so ; for the warrant, survey and return completed a contract for all the land contained within the boundaries called for. The proprietors had appointed the surveyor-general, and given him authority to appoint deputy surveyors ; if his officers injured him, he must bear it. The owner of the warrant found the two chain carriers and markers, or was bound to find them. It is by inaccurate measurement the quantity is generally affected ; and of this he had no right to complain. But let us look to the consequence of a re-survey of every tract ; if it contains too much, in what part is the overplus to be cut off, and in what shape ; and what, when the country was almost all a wilderness, and one, or ten, or twenty, or fifty acres were cut off, including the worst of the land, would it then have been worth to the proprietary ; or if the survey did not contain enough, from whom was the necessary addition to be taken ? The surrounding land might all be held by title. Could you fill up your quantity from the land of an innocent purchaser, and he again go into the land of his next neighbour ? After you had thus changed the shape and quantity of every tract in the country, what would become of your evidences of title in the land office ? Your returns of survey, your patents founded on them, would be all worse than useless, and all the conveyances, all the partitions, all the decisions of estates under proceeding by order of the orphan's court ; in short, all existing titles at the time of such re-survey would be unsettled ; and if such must be the consequence of a general re-survey, why, or on what principle is it to be had in a particular case ? By what authority can this court order it against the plaintiff in this case, if it has been refused, and must, for the general quiet of the country, and the security of all titles, be refused in all cases as a general rule. Our oldest reported decisions say the lines on the ground are the actual designation of the land ; that the return of survey is the only evidence of them ; and that if the actual lines on the ground and the returns differ, the former are to govern, though they change in some considerable degree the shape of the survey, or the quantity of the land ; Yoder v. Fleming, 2 *Yeates* 311; and more particularly Hare v. Powell, 4 *Serg. & Rawle* 468, where the course of one line, and distance of two lines were changed from the return of

[Norris v. Hamilton.]

survey, were altered so as to include near two hundred acres of overplus, but to reach a corner and line found on the ground.

But another matter is for our consideration. It is said the survey claimed by the plaintiff was not made so perfectly as it might have been ; that all the lines were not run and marked on the ground. Be it that the fact is so. It was partly proved, and partly admitted, that on the 8th of July 1784, twenty-one warrants were taken out. The leading warrant called for Clearfield creek below, and extending up to Little Clearfield, and the next ten adjoining each other up Little Clearfield; and ten warrants in like manner extending up the other side of Little Clearfield.

The course of Clearfield creek was accurately laid down for near a mile below the mouth of the little creek, and an ash tree was marked as a corner. It never was the usage to mark any other trees along a river or creek than the corners where you came to, or left the creek. It was fully proved that the corners of Little Clearfield had been accurately taken and represented in the drafts for all the distance of these surveys ; when this had been done, a corner was made on that creek, and a line run of a course parallel to the general course of Big Clearfield, and a black oak corner marked; so that a line run from this to the ash first mentioned on the bank of that creek, would inclose the eleven surveys. It seems that this line was not run in 1785, when the other work was done ; but it was fully proved that such a line had been run in 1792 from the black oak to the ash. The surveys had been returned in 1785, and the person who run this line in 1792 had marked carefully, corners at the proper distances, where the division lines between the eleven tracts would intersect that line. The eleven surveys lay on the south easterly side of that line : on the north westerly side, the land was then vacant, and so continued until the defendant's surveys were made, in 1794, adjoining, and calling for it as the line of these eleven surveys, which were then the property of John Nicholson. Nicholson also took out a range of warrants, one of which defendant bought in 1808. These last warrants and surveys called for and purported to adjoin his surveys of 1785. John Ashley had, in 1795, purchased the quarter part of the first eleven, and in 1800 taken out patents for them, and at different times sold the tracts to different purchasers; among others, one to James Hamilton, under whom the plaintiff claimed. This sale was in 1831. Hamilton immediately took possession; and finding the defendant within his lines, brought this ejectment. His death delayed it for some time, when his devisee proceeded, and in 1836 it was tried, and after two years this writ of error was sued out.

I have said that the warrant of the defendant was also taken out by John Nicholson, and along with it six or seven more. The leading warrant called for Nicholson's former lands, and one of the lines of the latter set of surveys was the line run in 1792, before mentioned ; so that whether you examined the warrants of the two sets of titles, or the returns of surveys, they appeared to adjoin each other, and not

to interfere.    About 1817 or 1818, a report was in circulation in that country that the surveys had been defectively executed, which induced many persons to apply for orders of re-survey, and among these was the defendant; and his re-survey was executed to include part of the plaintiff's land adjoining the line of 1792.    This led to the suit.

And here will arise two questions : From what is now ascertained from the land office and on the ground, is the plaintiff's title good, independent of the line of 1792; and is it better or worse for that line's having been run at that time, and marked, as it was proved to be, designating the corners of the eleven tracts?

I have said it was necessary, while all was wilderness, to adopt some mode of designating what land became the property of each purchaser; and that lines of marked trees were adopted as the mode of doing this.    If some of the lines were not marked, others might innocently and honestly apply, and purchase the land before sold, especially if it was without any occupant.    For a long series of years the only contest about lines was, whether the second claimant had been induced to settle or purchase without knowing, or without the usual means of knowing, that it belonged to a third person ; and while the deputy surveyor lived, or his assistant or chain carriers lived, it was possible, and often easy, to prove what lines were run of any survey ; and where a single survey was made for a person, it was usual to run all but the last or closing line.    This was very seldom run.    After the war of 1755, and more especially after the purchase of 1788, when the proprietaries granted land, first on location in 1766, and then on applications in 1769, neither of which required the payment of any thing more than the fees to the officers, it became usual for individuals or companies to take rights for many adjoining tracts at the same time.    These were all, so far as they were to adjoin each other, included in one set of outlines.    The division or interior lines dividing the tracts, were in no instance run. I can, partly from actual examination on the ground, and from the testimony given by surveyors in court, say that the practice of leaving the division lines of a range of adjoining surveys, unmarked, was universal on the waters, and in the valleys in Bedford, Huntingdon, Mifflin, Centre and Lycoming counties ; sometimes in a range of a dozen surveys, an end line was run ; then a long line which formed one line of each tract was run ; these are end lines, and the long line which formed the other end line of each tract was left as the closing line, and neither run nor marked ; and thus, except on the surveys at each end, all the others had but one line marked on the ground.    While those who made the surveys continued alive, the question in court was, how much work was done on the ground, and what would make a valid survey.    Thus in Fugate *v*. Coxe, 4 *Serg. & Rawle*, it was said that where there was proof that only one line of a survey was run, it would not make a valid survey. This was again sanctioned in Morris *v*. Travis, 7 *Serg. & Rawle* 220 ; but in the same case it seems to be admitted, that where several sur-

veys were made for the same person at the same time, the title may be good, though, on dividing them, only one line actually run on the ground is found to some of the tracts. This point was very important in the counties above mentioned. Much of the most valuable land, and oldest titles in the country depended on it. But the question soon assumed another shape. The men who had made, or assisted in making surveys before 1776 had all died; trees die too, and the practice, then too common, of burning the woods, destroyed many trees. This was not all. The doctrine that marked lines must be found, or the title was gone, held out a temptation too strong for the honesty of some individuals, and repeatedly it was proved that line trees had been intentionally destroyed. Courts then adopted another language, and a return of survey was held to be *prima facie* evidence that the survey had been made on the ground. One line, or part of a line, of an old survey, found on the ground, made the whole good.

In Lamburne *v.* Hartwick, 13 *Serg. & Rawle* 113; this was expressly decided by this court. That case, and Mock *v.* Astly, same book, 584, suggested in this court, and forcibly supported the position, that after a survey had been returned more than twenty-one years, the presumption that it had been legally made, became a violent presumption, or, as is said in the last case, not to be contradicted, and was the doctrine of some of the courts of common pleas before those cases, and of all of them since. In Caul *v.* Spring, 2 *Watts* 390, this subject was again before the court, and under singular circumstances. A man, I believe of good character, swore that he made a draft out for returning, and it was signed in Philadelphia, where the land office then was, and returned. That he made out the draft of that and other tracts, from general drafts then furnished him, and that he never was on the ground before or since. There was only one fact to contradict this; near the beginning corner (which was a corner of an old survey) were two trees marked as pointers, or as they are sometimes called " witnesses." These had been blocked, and the growths of one counted to the date of the old survey; the other counted many years less, to wit, to the year when the survey in question purported to have been made. The judge of the common pleas and the jury held the survey good; it was bounded by old surveys, which ought not to have been re-marked, and it had been returned and undisputed thirty-nine years. This court affirmed the judgment, and the reasons for doing so are incontrovertible. But I would go further, and say that the records of our land office are as sacred and as important as our deeds; and I would no more permit the one to be destroyed by parol evidence, after forty years, or a less time, than I would the other. Actual adverse possession will destroy the best title in twenty-one years: why should not actual possession, or what for this purpose ought to be an equivalent, actual formal legal title and payment of taxes, be valid against all the world: and especially when in the hands of a fair purchaser?

VII.—I 2

Those men whose consciences are, they say, so tender ; who are so zealous to correct all abuses against the state, that they will inquire into the correctness of official conduct fifty years ago ; if they can show that an officer long since dead, performed his duty carelessly or unfaithfully, they would say that a present innocent holder shall lose all right to the property, although the state was paid for it, and the owner has paid his proportion of taxes ever since. But unfortunately self mingles in this zeal : and it is to be taken from the present holder to be given to the discoverer of the alleged mistake at 10 dollars per one hundred acres. A man knows land has been surveyed and returned; it is against equity to permit him to take it for some defect or negligence of an officer unknown to the owner. 3 *Binn.* 38. That we must come to this decision at some period, has long been foreseen by every reflecting lawyer and judge. In many counties the best lands were surveyed a century ago. In all parts of the state, all, except very few tracts, were surveyed and returned above forty years ago. There is very little land but is now in the hands of *bona fide* purchasers. The deputy surveyors and assistants and chain carriers, with very few exceptions, are dead. The marked trees, by fires and hurricanes, and by natural and *artificial* means, are many of them gone. Our titles ought not to be good or worthless by reason of any thing dependent on accident, or on any other contingency. Neither parol evidence by any of the survivors of those who were present at making the survey, or who will swear they were present, nor the fact that all original marks have disappeared, ought to destroy a title perfect, according to our records, from its inception and completion for more than twenty-one years. Let it not be understood that any censure is cast on decisions by our distinguished predecessors. It might be perfectly reasonable and proper to require proof that a survey was made, and to inquire how it was made, as long as proof could be had of these matters. In case of our latest warrants, from 1792 to 1794, in nineteen cases out of twenty, this proof has become impossible. We must adopt some other standard of proof. The records of the land office seem to be the proper, if not the only one. The claimant of a tract of land must show a right to the tract in question; this must be by some remaining marks, or by its relation to some other tract or tracts, whose situation and extent is settled by legal title and long possession, or by some other mode which satisfies the jury of the identity of the tract claimed with the title exhibited.

I come now to the long line of 1792; it was run and marked to injure the title to the eleven tracts on warrants of 1784, or for no purpose relating to them, or to complete a range of surveys which had not, for some cause, been entirely marked on every side on the ground. If for either of the two first causes, it can do no harm, since it is plain that a third person coming after a survey, cannot by any act destroy a title already acquired. If done by the deputy surveyor, or his direction, to render perfect what had been left in some

[Norris v. Hamilton.]

respects unfinished, I can see no objection to it. True, after a survey is returned, the deputy surveyor cannot, without an order of the board of property, make a new survey, or change the lines returned; but I know of nothing to prevent him from marking a line left open or defectively marked. But it was on the ground when the survey of Martin's warrant was made in 1794; it was adopted as one of the lines of that survey: beyond it the owner of that warrant could not go. There was no error in saying it was entitled to great consideration and regard under all the circumstances in this case.

The cases cited, together with Martz *v.* Hartly, and Bellas *v.* Levan, 4 *Watts*, might seem to have been sufficient to put the material points in this case at rest. The whole court are in hopes the matters then and now decided will be considered as so established as not to be debatable ground. In most cases, what was once contested may admit of plausible argument again; but in the present instance, every year adds to the force of the reason on which the court has decided: and principles affecting every title in the state, when once settled, ought not to be disturbed.

One word more: this is the fourth instance during this term, in which the plaintiff has claimed an aliquot part greater than he showed title for, or claimed more acres than were, from the evidence, probably in possession of the defendant within the plaintiff's claim. In each case the court has given judgment on a general verdict for the plaintiff, and in each case this had been assigned as one of the errors, but never mentioned in the argument. Ever since the case in 1 *Burrows*, this matter has been settled, and often in our own books. Defendant may plead not guilty as to a specific designated parcel; if he does not do this, he ought not to complain that the issue is less definite than it might have been. If the plaintiff, in executing his *habere facias possessionem*, takes land for which he did not show title, the defendant is always relieved on motion.

Judgment affirmed.