## Glass *et al. versus* Gilbert.

1. The doctrine of Strimpfler *v.* Roberts, 6 Harris 283, and McBarron *v.* Glass, 6 Casey 133, that a trust will not be sustained between the warrantee and one who has paid the purchase-money after twenty-one years, without possession taken by the claimant, &c., does not apply to a stranger to the title of the warrantee.

2. In the question of the presumption of a grant, it is not necessary that actual possession should always be in the presumptive grantee.

3. The validity of a mortgage and the regularity of the judgment on a scire facias obtained on it, cannot be questioned by one not connected with the mortgagor's title as grantee, mortgagee, judgment-creditor, &c.

4. Philadelphia *v.* Miller, 13 Wright 440, explained.

5. To pass title by tax sale, the assessment must contain some element either of circumstances or name which leads to identification of the land.

6. The assessment is void only when it *wholly fails to lead* to identification.

7. Although there be no other element of description, if the *name* in which it is assessed has become linked to the land by some known claim of title or possession, it is a source of identification and will support the assessment.

8. Seventy years from the time of its location, a survey twenty years older than the one which endeavors to supplant it, is entitled to every reasonable presumption in its favor.

9. Slight marks on the ground corresponding with the survey should have great weight in repelling the charge of its being a chamber survey.

10. The evidence of one line corresponding to the time and location of the survey, or the existence of an older line made in pursuance of authority and shown by the return to have been adopted by the surveyor, is potent evidence that the survey was made on the land.

11. In recent locations the absence of all evidence of the lines of survey is strong proof of a chamber survey, where there are no natural boundaries corresponding to the survey.

12. If a chamber survey be made by the adoption of lines of older surveys made under authority of law to the same extent that is necessary to make a good survey on the ground, it is valid.

13. Where some of the lines only have been made by adoption; after a great lapse of time, not finding the evidence of original work on the lines not made by adoption, is not conclusive that it was not done.

14. If the survey was fitted only to a single line of an older survey, leaving the other lines unmade in figures of four or more sides, and the survey is finished by protraction on paper, it is invalid against a junior survey made within twenty-one years.

15. If twenty-one years elapse before interference by a junior survey, the

[Glass *v.* Gilbert.]

presumption in favor of the first, although a chamber survey, becomes absolute.

16. In surveys by blocks, it is not necessary to show the running of each warrant. It is sufficient if the entire body be surrounded by an exterior boundary as complete as would make a good survey, if it were contained in a single warrant.

17. In such case there might be but a single line marked for each tract; or if the tract were located in the interior surrounded by others on all sides, no side might be marked for it, and yet the survey would be good.

18. Adopted lines must be real lines made under authority of law, in order to prevent the survey adopting them from being a chamber survey.

19. Actual and chamber surveys discussed and applied to the case.

May 25th and 26th 1868, at Harrisburg. Before Thompson, C. J., Strong, Read, Agnew and Sharswood, JJ.

Error to the Court of Common Pleas of *Schuylkill county.* To January term 1867. No. 411.

This was an action of ejectment to March Term 1860, brought by Richard P. Foulke, William P. Foulke, and the Preston Retreat, against Alexander Glass, Jacob Eisenhuth and others.

The land in controversy was situated in Mahanoy township, and was reduced by disclaimer from the amount mentioned in the writ to a survey of 412 a. 91 p. After the suit was brought the plaintiffs conveyed their title to John Gilbert, who on the 11th of February 1867 was substituted as plaintiff.

The plaintiff claimed under two warrants dated February 11th 1794, to Sarah Moore and Henry Miller respectively, for 400 a. each, survey June 7th 1794 for 402 a. 97 p. each, returned September 3d 1794, and patent to R. P. Foulke and W. P. Foulke July 27th 1847. The defendant claimed under a warrant dated May 24th 1815, to Joseph Hoy for 400 a., survey June 9th 1815 for 412 a. 91 p., and patent to him July 8th 1815.

The relative position of the claims will appear by the accompanying diagram.

On the trial before Ryon, P. J., the plaintiff gave in evidence the warrant to Moore adjoining land " this day granted to Henry Miller," and warrant to Miller adjoining land " this day granted to Robert Whitehead." Moore's survey in Brunswick township, Berks county, by Henry Vanderslice, calls for Jacob Foust, Abraham Betz, William Jones and Henry Miller. Miller's survey by same surveyor calls for Jacob Foust, Robert Whitehead and Sarah Moore. Patents July 27th and 28th 1847, to Richard P. Foulke and William P. Foulke, for the Moore and Miller surveys (then) in Rush township, Schuylkill county.

Also, applications (all in Berks county and each for 400), endorsed " 11th February 1794. Houten, Millard, Palmer, Strembeck, Whitehead and others.

Berks county,                    26

Ent.,                          4—10,400

James McNeal."

[Glass *v.* Gilbert.]

[Glass *v.* Gilbert.]

" James Houtten adjoining George Demer on the north.

Thomas Millard adjoining lands of George Demer on the north.

David Ewens to join George Demer on the north.

Thomas Palmer adjoining lands this day granted to James Houtten.

Wm. Troutwine adjoining land this day granted to Thomas Millard.

Mary Strembeck adjoining lands this day granted to David Ewens.

Catharine Conorad adjoining lands this day granted to Thomas Palmer.

Isaac Price adjoining land this day granted to William Troutwine.

Grace Stonemetz adjoining lands this day granted to Mary Strembeck.

Charles Kirby adjoining land this day granted to Catharine Conorad.

Julianna Croft adjoining lands this day granted to Isaac Price.

John Strembeck adjoining land granted to Grace Stonemetz.

John Whitehead adjóining land this day granted to Charles Kirbey.

James Whitehead adjoining land this day granted to James Hutton on the east.

Richard Whitehead to adjoin land on the westward, this day granted to David Evans.

Robert Whitehead adjoining lands this day granted to Richard Whitehead.

Henry Miller adjoining land this day granted to Robert Whitehead.

Jacob Harges adjoining land this day granted to Henry Miller.

Mary Harges adjoining lands this day granted to Jacob Harges.

James Trembel adjoining land this day granted to Richard Whitehead.

Andrew Mattren adjoining land this day granted to Robert Whitehead.

Sarah Moore adjoining land this day granted to Henry Miller.

Sarah Millerd adjoining land this day granted to Jacob Harges.

Sarah Bender adjoining lands this day granted to Mary Harges.

John Reese adjoining land this day granted James Trembel.

Certificates same day from old purchase voucher 'No. 12,437, purchase-money paid 25 tracts.'   April 11th 1794 from old purchase blotter: 'Judge Wilson, 25 warrants, 400 a. each, at 50s— 250*l.*'

Judge Wilson, do. 26 warrants, 400 a. each, No. — in cash, and notes, 510*l.*

     Paid                            less 25*l.* 10*s.*
McNeal."

[Glass *v.* Gilbert.]

These certificates exhibit by name, &c., the same 25 warrants mentioned in the application.

Plaintiff further gave in evidence the following surveys with their warrants :—

Richard Whitehead calls, Robert Whitehead, David Evans, Jacob Foust.

Robert Whitehead calls, Richard Whitehead, Jacob Foust and Henry Miller.

James Trimble calls, George Strembach, John Reese, Richard Stephens, Jacob Foust and Richard Whitehead.

John Reese calls, Strembach and Stinemetz, James Hutten, Charles Shoemaker and James Trimble.

James Hutton calls, James Whitehead, John Kunkle, Evan Hughes, Charles Shoemaker, John Reese and Thomas Palmer.

John Whitehead calls, Charles Kirby, Andrew Matturn, John Kunkle and James Whitehead.

Sarah Binder calls, John Kunkle, Andrew Matturn, Mary Hughes, Julia Ann Craft and Isaac Price.

Isaac Price calls, Julia Ann Croft, William Finsham, John Strembach, John Kunkle and Sarah Bender.

John Strembach calls, Isaac Yarnall, lately John Fry, John Kunkle and Isaac Price.

·Also surveys *West of batch,* viz :—Isaac Yarnall and John Kunkle, Jr.

*East of batch.*—Abraham Betz, calls, vacant on south; west, Conrad Mertz and vacant; north, Edward Middleton and vacant; John Whitman and Andrew Lytle, calls, vacant, and Abraham Betz, Conrad Mertz.

*South of batch.*—John Kunkle, calls, Mary Kunkle and vacant; Richard Stevens, calls, vacant; William Jones; Abraham Betz; Whitman and Lytle; Conrad Mertz, calls, Abraham Betz and Edward Middleton; George Flower, calls, Conrad Mertz on east and vacant.

Also patents January 4th 1788, to Jacob Foust for the Mertz and Flower surveys.

He then offered in evidence mortgage James Wilson to Charles Wolfstonecroft and others, dated June 14th 1794, "of all those several tracts of land surveyed or to be surveyed, which James Wilson, &c., by articles of April 3d 1794, with Thomas Grant, &c., had a right to in conveyance of entries in the land office, of which a list is annexed to the articles, &c., and the several tracts surveyed or to be surveyed by virtue of warrants issued, &c., in consequence of payments mentioned in the receipts hereto annexed." The mortgage recorded September 11th 1794, but not the articles and receipts mentioned in it. The record of a scire facias sur mortgage to March Term 1829, William Parker, assignee of Charles Wolfstonecroft and others against Burd Wilson and John

[Glass *v.* Gilbert.]

Adlum, surviving administrators, &c., of James Wilson, deceased. Debt 85,723*l.* 6*s.* 8*d.* Returned "Nihil." Alias scire facias to October Term 1829; both sci. fas. reciting the mortgage, but not referring to the articles or receipts. Returned "Nihil," October 28th 1829. Judgment for plaintiff on motion.

Pluries levari facias to July Term 1831. Annexed to this writ are the receipts mentioned in the mortgage, together with a list of all the warrants for which the receipts were given, including the Moore and Miller warrants. Return, "Sold to William Parker." Sheriff's deed to Parker for land described in scire facias, acknowledged in open court October 25th 1831. Will of William Parker proved July 5th 1845, devising the land purchased at sheriff's sale to William P. Foulke and Richard P. Foulke; deed May 14th 1847, Bird Wilson and Emily Hollingsworth, heirs of James Wilson, deceased, to the two Foulkes for 23 warrants, including the Moore and Miller. Deed November 13th 1847, R. P. and W. P. Foulke to Preston Retreat for an undivided half of the 23 warrants; will of R. P. Foulke, proved August 29th 1860, devising his interest to W. P. Foulke and deed April 3d 1863; W. P. Foulke and Preston Retreat to the plaintiff, Gilbert, for the Moore and Miller warrant; also that the plaintiffs went into possession under a claim of title in 1836, paid taxes to the present time under the Wilson title, that no claim against plaintiffs has ever been set up against them under that title or the warrants and surveys of Wilson.

The offer was objected to by the defendants and admitted by the court, reserving its effect and the right to reject the evidence. The court sealed a bill of exceptions for the defendants, which was the first bill.

The plaintiffs then offered the petition of Charles Whitman, administrator, &c., of William Whitman, deceased, presented July 27th 1827, praying for the sale of certain land for the payment of the debts of the decedent, amongst others: A certain quantity of land, composed of 23 tracts, situate on the waters of Mahanoy creek, Schuylkill county, Brunswick township, adjoining lands of Wm. Jones, Abraham Betz, Jacob Foust, Richard Stephens, Evan Hughes, Chas. Shoemaker, John Kunkle, Isaac Yarnall, John Fry, and others, and containing in the whole 9210 acres, which includes the land in dispute; order granted same day; also alias order December 29th 1828, return of sale of 33 tracts to Joseph Lyon and Benjamin Coombe for $7087.50 confirmed July 27th 1829; deed April 30th 1833, Charles Whitman, administrator to B. Coombe and J. Lyon, deed same day Lyon to Coombe, for his undivided interest; mortgage June 4th 1835, Coombe to Jonas Preston on the 23 tracts. Assessment in 1835, 800 acres in Rush township as unseated land, in the name of B. Coombe, "tax 2400 — 400."

[Glass *v.* Gilbert.]

Treasurer's Sales Book for 1836, for unseated land. "Sale, 800 acres, Coombe, Benjamin, $28. Purchaser do., bid 31; paid 31.62."

Judgment on the mortgage and sheriff's sale to Preston Retreat, deed acknowledged March 30th 1840.

This offer was objected to by defendants, admitted, and the second bill of exceptions sealed.

The plaintiff then proved by John Bannan, Esq., that he had inquired of Coombe for the treasurer's deed; he could not produce it, but supposed it had been burned; witness inquired of the Foulkes and of the officers, &c., of the Preston Retreat. Gilbert, the plaintiff, testified to inquiries of officers of Preston Retreat and executors of Jonas Preston. F. W. Hughes, Esq., testified that he was counsel for Foulke and Preston Retreat; that Foulke had charge of the papers, and spoke of the deed being lost; witness frequently had examined their title papers, and never saw the deed.

The plaintiff then offered entry of treasurer's deed in prothonotary's office, as follows:—

"Joseph Ottinger, Treas., to Benjamin Coombe, produced in open court on 27th July 1836, a deed dated 26th July 1836, for a tract of unseated land in Rush township, for 800 acres, and owned by Benjamin Coombe, and sold as land of said Benjamin Coombe, for taxes, &c., and assessed for $31."

Also treasurer's cash book; "13th June 1836, By cash received of Benjamin Coombe taxes and costs on a tract of land in Rush township, sold to him, $27.62."

The offer was objected to, admitted by the court, and third bill of exceptions sealed.

The plaintiff then gave in evidence the deposition of Coombe. He testified that he had owned land in Rush township, north of the Conrad Mertz survey, bought at Whitman's sale, the warrantee names of two of the tracts were Sarah Moore and Henry Miller; they were surveyed for him in 1830, 1831 or 1832, by Thomas Baird:—when running the line between these warrants and C. Mertz', they struck the lowest corner of Mertz down the Mahanoy creek, on the line between the Mertz and the Moore and Miller; Baird blocked several trees, one agreed with the date of the Moore and Miller, they ran the whole line. Whilst witness owned the land he did little on it, sunk one shaft hunting for iron-ore, cut no timber, put no buildings on it; employed one Keply to see that there was no trespassing. It was admitted that about two-thirds of the Henry Miller are claimed by the city of Philadelphia on older surveys; the claim in this suit is for the part of the Miller not covered by the city, and for the whole of the Sarah Moore.

Plaintiff offered a book in the handwriting of Vanderslice, de-

[Glass *v.* Gilbert.]

puty surveyor, purporting to be his field notes, obtained from the custody of one of his successors, to show the surveys of the Conrad Mertz, George Flower, Abraham Betz and William Jones. Objected to, admitted, and fourth bill of exceptions sealed.

Conrad Mertz, May 4th 1787, begins at post corner of Betz, by same and Middleton, southwardly to a post corner of Middleton, &c., all corners being posts. Abraham Betz, May 3d 1787, begins at a post corner of Middleton, eastwardly to post corner of same, northwardly to a post westwardly by vacant and Mertz, southwardly passing corner of Mertz to beginning. George Flower, May 5th, 1787, begins at post in Mertz, and south, west, north and east by vacant land to beginning, all the corners are posts.

The plaintiff further offered—

"Assessment for Barry township, 1835. Seated list. Coombe, Benjamin, 2400 acres at $4, . . . . . $9600
Saw-mill, . . . , . . . . 300
                                                    ————
                                                    $9900"

in connection with the location of 11 older surveys upon the 23 tracts claimed by Coombe, except 800 acres on the eastern end of the batch of 23 warrants and 2400 acres in the township of Barry, those locations being claimed by the city of Philadelphia, and that so far as they interfere with Coombe, they were assessed to the city in the names of the warrantees in 1835. The offer was objected to, admitted and the 5th bill of exceptions sealed. The assessment as above was given in evidence, together with the locations and patents of the 11 surveys to Robert Morris in 1794.

Samuel Lewis, a surveyor, testified that the 500 acres (in controversy) were in Rush township in 1835. Mahanoy township was taken from Rush in 1849.

Plaintiffs offer to ask witness, "Did you know in 1835 any body of lands in Rush or Barry, or both, that was called Benjamin Coombe's?"

Objected to and admitted, and 6th bill of exceptions sealed. Witness answered, "I knew a body of land in Barry township in 1835, then called Benjamin Coombe's land; they were below Girardville and Ashland; I know nothing about the quantity; I was passing along the road with Mr. Baird, agent of the city, and we came to a body of land below Girardville, where there was a new saw-mill building; I am under the impression that Mr. Coombe was there superintending the building of the mill, and Mr. Baird said it was Coombe's."

Witness found no marked lines on the Conrad Mertz for certain, no marked lines on the Abraham Betz counting to survey; found one or two on the William Jones counting to that survey; old timber was principally burned, what was left has fallen between Jones and Sarah Moore; found some marked trees on that

8 P. F. SMITH—18

[Glass *v.* Gilbert.]

line; could not ascertain the date, marked trees between Jones and Betz, counted to the date of Jones's survey. Jones adjoins Betz; Sarah Moore adjoins Betz and Jones; Miller adjoins Moore and Mertz; found marks of western line of Betz (eastern line of Moore).

Hoffman, a surveyor, testified that he surveyed a number of the tracts and found some marks of seventy years or more on many of the lines, and about Betz's corner, called "Middleton Hemlock." On the west line of Betz, found a marked tree counting forty-three years. The Henry Miller and Sarah Moore are located according to the calls and return of survey; witness did not go around them for marks; found other surveys by the marks on the ground; on some, marks corresponding to date of survey.

The plaintiff gave in evidence an official certificate of Vanderslice, showing that the Moore and Miller surveys were returned September 3d 1795. He offered assessments of the 2400 acres in Barry township and 800 acres in Rush assessed to Benjamin Coombe, and those claiming under him, and William Parker, from 1836 to 1860, inclusive.

Objected to by the defendants, admitted and the 7th bill of exceptions sealed.

Also, that Coombe entered on the 2400 acres, part of the 23 tracts, in 1831, built a saw-mill and barn, and made a clearing, and that the possession was kept up by him and those claiming under him and William Parker from that time until the bringing of this suit, and that the plaintiffs and those under whom they claim were in the constructive possession and care of the 800 acre tract by paying taxes and guarding against trespassers until a few months previous to the bringing of this suit, when it is proposed to prove the defendants entered stealthily into the possession by building a cabin and placing a tenant therein before its completion.

Objected to, admitted and 8th bill of exceptions sealed.

D. Frack testified: A. F. Glass built a house on the premises in controversy in 1857; his brother lived in it in 1860; he had no family, no one lived with him.

G. Brosius testified: A saw-mill was built on the premises in 1829, 1830 or 1831 for Coombe, houses were put up not far from the mill, land cleared for gardens around the houses, people have been living in them all the time till now. D. Brosius testified substantially the same; and that the premises were claimed by Foulke since Coombe; Stephenson cut timber under Foulke.

Lewis testified that Gillingham was the first agent of the premises for Preston Retreat; Shaeffer after him for Foulke and The Retreat; Stephenson was there fourteen or fifteen years under Gillingham. Transcript showed assessments in Rush township of unseated land, 800 acres in the name of Coombe from 1835 to 1851, inclusive.

[Glass v. Gilbert.]

The defendants gave in evidence application May 24th 1815, of Joseph Hoy; warrant same day, survey June 9th 1815, for 412 a. 91 p. in township of Schuylkill, adjoining "Theophilus Youth or vacant," and patent July 8th 1815, to Joseph Hoy for same tract.

Also sundry conveyances passing the title to the defendants, the last deed being dated October 7th 1856; also warrant and survey April 9th 1794, to Daniel Ewings for 400 a.; calls, Richard Whitehead, James Trimble and Mary Strembach, Brunswick township, Berks county.

D. S. Zacharias' surveyor testified to marks on the eastern, northern and southern line of Hoy's survey counted 50 years in 1865; no difficulty in finding the lines; found no marks on the lines of Betz and Jones; found no marked trees of the date of Flower and Mertz; found no lines on the Sarah Moore and Henry Miller to the date of the survey; the waters, as laid down on those surveys, run towards the top of the mountain; the Sarah Moore and Henry Miller interfere with Joseph Hoy; found nothing to warrant that the Mertz and Flower were laid on the ground at the time of the survey; nothing to show that the Betz was located where it purported to be; the Jones the same way; thought that the Moore and Miller were not located on the ground; had no doubt they were chamber surveys; not usual to call for posts when there is plenty of timber as here.

D. Rockafeller, a surveyor with Zacharias, testified: His recollection the same as Zacharias; thought the Moore and Miller were not marked on the ground.

G. West, a surveyor with Rockafeller and Zacharias, testified to the same effect as they, that the Moore and Miller and adjoining surveys were chamber surveys.

Joseph Hoy, son of warrantee, testified: His father claimed the land forty-eight or fifty years, and by his order witness then took shingles from it. B. Eisenhuth was on the land in 1835, in a shanty; he had an interest in it under Hoy. There was other evidence of Eisenhuth occupying the tract.

Defendants also gave in evidence, record of an habere facias:—

A. F. Glass and others (defendants here) against James McBarron and others for this land, under which possession was delivered to the plaintiffs in February 1855.

Also list of assessments on seated and unseated lands in Rush township from 1826 to 1850, and in Mahanoy township from 1851 to 1861, showing assessments to the defendants and their predecessors, including the Hoy survey.

There was a great mass of testimony in addition on both sides, bearing principally upon the character of the Moore and Miller surveys and that of their adjoiners. The plaintiffs' points were:

1. The payment by Wilson of the purchase-money of the

Moore and Miller warrants made him their equitable owner. The sheriff's sale and deed under the Wolfstonecroft mortgage to Parker, the release to R. P. and W. P. Foulke, his devisees, by the heirs of Wilson, and the patents to the Foulkes placed the title in them against every one not claiming under Sarah Moore and Henry Miller.

The judge negatived the point so far as it asserted an equitable ownership in Wilson.

He further answered that the sale under the mortgage and the release of Wilson's heirs gave Wilson's whole title to the Foulkes, and if the jury found from the evidence sufficient to presume a conveyance from the warrantees of the Moore and Miller to Judge Wilson or to some other person under whom the plaintiff claims, which conveyance has been lost, then the whole legal title to the Miller and Moore surveys is vested in the plaintiff; but declined to charge that the plaintiff is entitled to recover upon these facts alone. The judge then referred to the facts in the case from which the jury might presume a conveyance; and added : " Hence, though the evidence of actual conveyance be inconclusive, yet if it can be ascertained at what period the legal estate ought to have been conveyed, such conveyance will be presumed after the lapse of thirty years, and possession, or what is equivalent in wild land, acts of ownership and payment of taxes by the cestui que trust or those under whom he claims, and the acquiescence and silence of the trustee."

2. The Miller and Moore surveys are part of a batch of 23 surveys known as the Wilson surveys, returned by the surveyor as made on the ground nearly twenty-one years before Hoy's warrants. If these warrants were surveyed on the ground, which is for the jury, or the surveyor was there before he made them locating adjoining surveys, to which he attached these surveys and located them on older surveys, by which they can be identified as official, the title under them is good, if they identify and embrace the land now claimed.

The judge affirmed this point.

The defendants' points were : —

1. If the jury believe from the evidence that the Moore and Miller surveys were not made and marked on the ground before they were returned, but that the survey of Hoy was made by the deputy surveyor and marked on the ground on the 9th of June 1815, the patent vested in him a title to the land within the survey against the Moore and Miller and all persons claiming under them, and this even if the eastern line in the Moore survey called for as the western line of the Betz and Jones was actually made on the ground for the latter surveys.

The judge answered :—

" If we understand this point it asserts that if the deputy sur-

[Glass *v.* Gilbert.]

veyor did. not actually run and mark the lines of the Sarah
Moore and Henry Miller on the ground, before the survey was
returned on the 2d September 1794, that it is not a valid survey
against the Joseph Hoy survey, made in 1815, though the jury
should believe that the eastern line in the return of survey of the
Sarah Moore, therein called for as the western line of the Abra-
ham Betz and William Jones surveys was actually marked on the
ground for the latter surveys.    Thus understanding, we answer :
A survey must be made either by the deputy surveyor going upon
the ground and marking the lines and courses upon trees and the
designation of natural boundaries on the courses, along which the
lines of survey pass or at which they terminate, or by locating
his survey adjoining older surveys marked upon the ground in
such a manner that the lines of the older adjoining tracts will
identify and establish the new survey and designate its situation
and extent with certainty.    The deputy surveyor need not in all
cases go upon the ground, and if that be necessary he need not
run all the lines ; if he find the line of an official survey marked
on the ground, he may adopt it.    The 9th section of the Act of
8th April 1784, like the instructions under the proprietary sys-
tem, has been held to be merely directory, and intended for the
benefit of the owner of the warrant, and should not be construed
to his prejudice.    If Henry Vanderslice, knowing the location
fixed by him for the Betz and Jones surveys, having marked the
western line of them on the ground, and located the Sarah Moore
so as to adjoin these old surveys on the east, and calling for them,
the lines of the older, on the side on which the younger lies, are
what are called for, and here the surveyor was not expected to
run and mark new lines.    The adoption of a single line would
not make a valid survey, in the absence of any other marks."

2. The call in the survey of the Sarah Moore, for the western line
of the Betz and Jones, as the eastern boundary of the Sarah
Moore is a call for a line as already marked, and actually existing
upon the ground, in 1794, and is not for a line which might there-
after be ascertained and marked by the protraction or location of
the surveys of Betz and Jones, and if the Betz and Jones are
chamber surveys, or if no part of their western line had been run
upon the ground, then it was the duty of the deputy surveyor in
1794, to mark the eastern line of the Sarah Moore upon the
ground, and his failure to do so is not excused or supplied by the
call in the return of survey.

Answer: " The presumption is that the deputy surveyor per-
formed his duty and marked the lines of the Betz and Jones sur-
veys on the ground.    The call for the Betz and Jones by the
Sarah Moore is for the line of these older surveys, as then (1794)
fixed by the marks upon the ground, and the line thus called for
as an adjoiner by the Sarah Moore was adopted and became the

[Glass *v.* Gilbert.]

eastern line of the Sarah Moore. Old lines are not to be re-marked but adopted for the lines of the younger on the side to which the younger calls to adjoin. But time destroys the evidence of surveys. * * * A title perfect according to the records of our land office ought not to be good or bad by reason of anything dependent on accident or any other contingency, and hence in determining the location of the line of the old survey to which a younger survey calls to adjoin, in the absence of marks now to be found on the ground, we must have reference not only to what the axeman did, as to that particular line of the older survey which is called · for by the younger when the older was made, but also what was done by the deputy surveyor in making the whole of the older survey. The marks upon the other lines of the older not only aid in determining the location of the particular lines upon which the marks are found, but help to determine the location of the whole survey. Hence a marked line on the ground is not always necessary upon the side of the older upon which the younger calls to adjoin to make the call of the younger valid. In the absence of a marked line on the side of the older, on which the younger calls to adjoin, the lines of the older must be determined by the marks upon the whole survey. After a survey has been made and returned to the land office, the deputy surveyor has no right to change or alter the lines marked and returned, or to mark new lines, and his acts in such case are unofficial, and not binding on the owner. A chamber survey unimpeached is a valid appropriation; if from lines and marks upon the ground, called for and adopted for such survey, the jury are satisfied of the identity of the land, and the boundary of the old survey, establishes the new survey."

4. The old purchase blotter is only primâ facie evidence that Wilson paid for the 25 warrants, mentioned in the old purchase voucher, and after a lapse of fifty-two years, without any claim to or ownership of these lands having been asserted by James Wilson, his heirs, or any other person claiming under him, and without any possession of the land taken, or taxes upon them paid by him or them during all that time, the blotter and voucher are insufficient to prove any title to the tracts in James Wilson or his heirs, and the deed of Bird Wilson and Emily Hollingsworth to William P. and Richard P. Foulke for the Sarah Moore and Henry Miller tracts was without authority, and conveyed to them no title for the land previously patented to Joseph Hoy, in 1815, and the Sarah Moore and Henry Miller title cannot be used by the plaintiff to recover from the defendants the land surveyed to Joseph Hoy.

Answer: "This is affirmed, if the jury find that the facts are not sufficient to raise the presumption of a conveyance from the

[Glass *v.* Gilbert.]

warrantees to Wilson, as we have before explained to you. If you are satisfied to find such a presumption, the point is negatived; the fact is for you."

6. There is no evidence to justify the jury in presuming deeds from Sarah Moore or Henry Miller to James Wilson, or to any other person under whom the plaintiff claims.

This point was refused by the court.

The judge in his general charge amongst other things said:—

* * "Is there evidence sufficient to raise the presumption of a conveyance from Sarah Moore and Henry Miller to Judge Wilson or some other person under whom the plaintiff claims, which has been lost? The presumption of a conveyance stands upon different grounds from a trust resting in parol, such as we have just explained to you. In the earlier period of the history of our land laws in Pennsylvania, a warrant and survey were looked upon as personal property, and subject to alienation with less form than patented lands, and the possession of the plaintiff, and those under whom he claims, and the exercise of ownership over these lands from about 1830, and no adverse claim or challenge of their right by the warrantees or any one claiming under them, or any assertion of that title, inconsistent with the plaintiff's claim, from 1794 to this time, are strong reasons to suppose that the right of Sarah Moore and Henry Miller had been vested in Judge Wilson, or William Whitman, or some other person under whom the plaintiff claims, by some writing which has been lost. If this had not been the case, it is difficult to account for the long and uninterrupted possession under the plaintiff's title of those tracts where the saw-mill was erected, and the claim of title and payment of taxes as to the land in question.

"The defendants claim under a subsequent survey, made and patented in 1815, and hence hold a hostile title to that of Sarah Moore and Henry Miller, and they do not, nor could they assert the title of Sarah Moore and Henry Miller,—a presumption of a conveyance to the defendants, therefore, would be inconsistent with their acts. This assertion of the plaintiff's title was not by a single contested act of ownership, but in acts repeated and persisted in for more than thirty years as to these lands, not conflicting with the city lands, and without any adverse claim, by or under the original warrantees. This is evidence upon the subject of a presumptive conveyance from Sarah Moore and Henry Miller to Judge Wilson, or to some other person under whom the plaintiff claims, and we submit it to you. This, like other evidence is subject to be rebutted by countervailing proof, but we know of none in the case, and therefore think you ought to presume that a conveyance was made by the nominal warrantees, although we submit the whole question to you." * * * *

[Glass *v.* Gilbert.]

\* \* \* "Now, Benjamin Coombe claimed these lands about 1830, and had a survey made of the Sarah Moore and Henry Miller, on the south line of the Moore and Miller, and on the north line of the Conrad Mertz; he says Thomas Baird, the surveyor, blocked a tree marked for a line tree which counted to the date of the Miller and Moore surveys. Charles M. Lewis, a surveyor, swears that he surveyed the John Stemback in February 1834, upon the eastern line of that tract adjoining the Mary Kunkle; he found one line tree which counted 58 or 59 years; he blocked the tree, and also a line tree on the southern line of the same tract, which counted 59 or 60 years—difficult to count. If this tree was marked in June 1794, the subsequent growth of that year would not be very distinctly developed.

"When a tree is found upon the corner of the line as returned in the official survey marked as a line tree, which counts to the age of the official, the presumption is that it was made for that survey, unless there are facts and circumstances in the case which lead to a different conclusion. The whole southern tier of these 23 tracts, beginning at the John Stemback on the west, calls for older surveys on the south, the old Kunkle's near the west end of these surveys, and the Stevens, Evan Hughes and other older surveys on the south, coursing eastwardly and marked on the ground the date of the official surveys. Each of these old surveys are the calls by the Wilson surveys for the Mertz and Flower or Jacob Foust. Again, three of these 26 warrants were located south of the Mertz and Flower, and their northern lines are well marked on the ground. These three tracts are returned as having been surveyed on the 4th, 5th and 6th of June respectively, and the Sarah Moore on the opposite or north of the Mertz, on the 7th of June. Nearly seventy-three years have elapsed since the surveys were returned. The deputy surveyor, his chain and axe men, it is more than probable, are all dead. Time, tempest, fire and the destructive hand of man obliterate landmarks, and hence the courts have not only said that the returns of the surveyor should be primâ facie evidence that the survey was made upon the ground, but that the return was entitled to great consideration after the lapse of more than half a century, and but slight evidence of lines or corners marked are sufficient for the jury to presume that the survey was made as returned. And also that one line or a part of a line of an old survey found on the ground, made the whole good.

"If you believe the evidence of Coombe and Charles M. Lewis, and that the trees respectively sworn to by them were marked as line trees, counting to the date of the official surveys, we say to you that the presumption that they were marked by official authority is strong, after so great a lapse of time, and the fact that no

[Glass v. Gilbert.]

trees are found on the other lines of these tracts is not sufficient to rebut that presumption.

"If you come to the conclusion that the Moore and Miller surveys were surveyed and marked on the ground, as returned by the deputy surveyor, and the land in controversy in this case is embraced within the lines of these surveys, we think under all the evidence in the case, the plaintiff is entitled to recover." * * * *

* * * "What calls for adjoiners will make a valid survey when no lines are found upon the ground answering to the date of the official survey? The southern line of the southern tier of warrants call to adjoin older surveys. Also the Sarah Moore calls to adjoin the William Jones and Abraham Betz on the east, and the Henry Miller calls for Sarah Moore on the east. We say to you that if the evidence shows that Henry Vanderslice, deputy surveyor, was upon the ground at the time he says he made these surveys for the Moore and Miller, or was upon the ground before, making other and adjoining surveys, to which he attached these surveys, and if he did locate them to adjoin older official surveys then upon the ground, by which they can be identified as official surveys, the appropriation is a good one against a subsequent warrant and survey, and if the Moore and Miller were so located and embrace the land in controversy, it was a valid appropriation of the land, as against the Joseph Hoy, surveyed nearly twenty-one years after. It is not necessary nor proper for the surveyor when he locates a younger survey to adjoin an older, to mark the lines of the younger on the side where the older is called for; in such case the lines of the older become the lines of the younger, and to re-mark the old lines would only confuse, and sometimes lead to fraud. This whole question is one of fact for you." * * * * * * * *

"The old surveys on the south of the southern tier of the 23 warrants, the old Kunkle's, Hughes', and Lehman's and others are indisputably upon the ground, and well marked, except where the line trees have decayed, or been cut away. The Mertz and Flower have no marks upon them, and they are located by the call of the Mertz for the 'Middleton Hemlocks' and the Abraham Betz, and the call of the Flower for the Mertz *on the east*. The Conrad Mertz was surveyed the 4th May 1787, and the George Flower on the 5th May 1787. The majority of the surveyors on the stand have located the Mertz, by commencing at the 'Middleton Hemlocks' on the eastern boundary. There is no return of survey for the Edward Middleton, but the corner called the 'Middleton Hemlocks' is well marked on the ground, and counts to 1776. From this corner the line extends east $44_{\frac{7}{10}}$ p. to another corner, &c. This line is found to run several courses, but there are not sufficient lines now to be found to enclose a survey. But Mr. Samuel Lewis and others have testified

[Glass *v.* Gilbert.]

that this old corner and lines are known as a part of an ancient, unreturned survey, in the name of Edward Middleton. This Middleton line is well marked, and if the deputy surveyor adopted this line as a boundary for the Conrad Mertz, it is a valid call, and if sufficiently definite may locate the Mertz from it." * * *

" The Abraham Betz is also an old survey, made 3d May 1787, and calls for the Edward Middleton and Conrad Mertz ; and so the William Jones, an older survey, calls for the Abraham Betz on the south. Henry Vanderslice made all these surveys. Messrs. Lewis Hoffman and others locate these tracts by their calls as adjoining the Sarah Moore and Miller, and none of them have junior surveys interfering with them. In locating these older surveys you will take into consideration the calls of surveys subsequent in date to them. They afford some evidence of the true location, which is strengthened by the fact that they were made by Vanderslice, the same surveyor, and but a few years apart. Also, the opinions of the surveyors called upon the stand as to the proper location of these old surveys. They are gentlemen of experience and science and their opinions are worthy of consideration." * *

" In 1835 the Sarah Moore and Henry Miller were assessed as 800 a. as the land of Benjamin Coombe. Benjamin Coombe was then claiming to own the land. The taxes were not paid and the land was sold as unseated by the treasurer in 1836 to Benjamin Coombe.

" Benjamin Coombe was claiming to own the land, and held at least a colorable title to it. We think the assessment, if upon the land in question, and this is for the jury, was in the name of a person connected with the title and sufficiently descriptive of the land.

" If the true title to the land assessed and sold for taxes was at the time in Coombe, he took nothing more than he had before by his purchase, but if his title was defective there is nothing in reason or law to prevent him from perfecting his title by a purchase at a tax-sale. If the party stands in no relation of trust to the owner, and is implicated in no fraud against him, his measures to perfect his title by a purchase at a sale for taxes will not enure to the benefit of the owner."

The verdict was for the plaintiff.

The defendants took a writ of error, and assigned the following errors :—

1 to 8. The defendants' several bills of exceptions.

9 to 14. The foregoing extracts from the charge.

15, 16. The answers to plaintiff's points.

17, 18, 20, 21. The answers to the defendants' 1st, 2d, 4th and 6th points.

*B. W. Cumming* and *J. W. Comley*, for plaintiffs in error.—

[Glass v. Gilbert.]

The mortgage was not properly recorded; it was only part of the instrument: Act of March 18th 1775, § 6, 1 Sm. L. 424, Purd. 310, pl. 2. As to the deed from Wilson's heirs, there had been no title shown in them: Faulkner v. Eddy, 1 Binn. 190; Peters v. Condron, 2 S. & R. 83; Kennedy v. Skeer, 3 Watts 95; Warner v. Henby, 12 Wright 190. The payment of purchase-money by Wilson without exercising acts of ownership would not give him title: Strimpfler v. Roberts, 6 Harris 297. Vanderslice's book was not produced by a proper official custodian: Blackburn v. Holliday, 12 S. & R. 140-1; Urket v. Coryell, 5 W. & S. 79. There was no evidence of identity of land sold for taxes as Coombe's, to show it to be that in controversy: Philadelphia v. Miller, 13 Wright 449; Woodburn v. Wireman, 3 Casey 18. Coombe's possession of the 2400 acres in Barry could not affect the Moore and Miller in Rush: Hole v. Rittenhouse, 7 Harris 305. As to presumption of conveyance: Galloway v. Ogle, 2 Binn. 468; Taylor v. Dougherty, 1 W. & S. 324; Warner v. Henby, *supra;* McBarron v. Gilbert, 6 Wright 268. As to the question of the surveys being made on the ground: Faulkner v. Eddy, *supra;* McDowell v. Ingersoll, 5 S. & R. 105. If the court review facts on one side only, it is error: Parker v. Donaldson, 6 W. & S. 132. It is not necessary the closing line of a survey should be run, when it is bounded on the other sides by actually run lines of older surveys: Caul v. Spring, 2 Watts 393; Fugate v. Coxe, 4 S. & R. 294; Act of April 8th 1785, § 9, 2 Sm. L. 320, Purd. 628, pl. 65. But one or two sides of a survey consisting of more than three sides are not sufficient.

*J. Ryan* and *F. W. Hughes* (with whom was *T. R. Bannan*), for defendant in error.—The question is whether the mortgage was good against Wilson. Contracts are to be enforced according to the intent of the parties: Galbraith v. Fenton, 3 S. & R. 359; Garber v. Henry, 6 Watts 59; Friedly v. Hamilton, 17 S. & R. 70. What points to where information may be had is notice: Luch's Appeal, 8 Wright 519; Jacques v. Weeks, 7 Watts 261; Britton's Appeal, 9 Wright 172. The defendants cannot question the validity of the judgment on the mortgage: Colley v. Latimer, 5 S. & R. 211; Burdick v. Norris, 2 Watts 28; Hauer's Appeal, 5 W. & S. 473; Withers v. Hines, 2 Barr 438; Drexel's Appeal, 6 Barr 272. Any evidence of title in the grantor, however slight, will authorize his deed to be given in evidence: Zeigler v. Hautz, 8 Watts 380; Sailor v. Hertzogg, 10 Barr 314; Dikeman v. Parrish, 6 Id. 225. Possession and acts of ownership to rebut ownership of warrantees need not be such as would be required to give title under the Statute of Limitations: Brock v. Savage, 7 Casey 410; Hunt v. Devling, 8 Watts 403; Williams v. Hillegas, 5 Barr 492; Hastings v. Wagner, 7 W. & S. 215. The record

[Glass *v.* Gilbert.]

of treasurer's deed is not secondary: Reinboth *v.* The Zerby Run Imp. Co., 5 Casey 139; Stonebreaker *v.* Short, 8 Barr 155; Feger *v.* Keefer, 6 Watts 297; Shrider *v.* Nargan, 1 Dallas 69. Vanderslice's book was produced from the proper custody, and bore on its face marks of antiquity and genuineness. Such documents are evidence: Unger *v.* Wiggins, 1 Rawle 331; Stevens *v.* Wylie, 1 Barr 458; Payne *v.* Craft, 7 W. & S. 458; Ross *v.* Rhoads, 3 Harris 163; Galbraith *v.* Elder, 8 Watts 81; Sweigart *v.* Richards, 8 Barr 436. Where one pays the purchase-money for land, and he and his successors pay taxes, and exercise control over it, patents taken out by him who made the application will enure to the benefit of him who paid the purchase-money, although more than twenty-one years have elapsed since issuing the patent: Brock *v.* Savage, 7 Casey 410; Taylor *v.* Dougherty, 1 W. & S. 324. To raise the presumption of a conveyance from warrantee, much less evidence is required than for a title under the statute: Brock *v.* Savage, *supra*. A title is never presumed to be transferred to an adverse claimant: Orr *v.* Cunningham, 4 W. & S. 294. When a new survey is made calling for the lines of an older survey, there is no occasion to mark the trees anew: Covert *v.* Irwin, 3 S. & R. 283; Schnable *v.* Doughty, 3 Barr 399; Fugate *v.* Coxe, *supra;* McRhea *v.* Plummer, 1 Binn. 227; Mock *v.* Astley, 13 S. & R. 384; Lambourn *v.* Hartswick, Id. 113; Morris *v.* Travis, 7 Id. 220; Stevens *v.* Hughes, 3 W. & S. 468; Brown *v.* Arbuckle, 1 W. C. C. R. 484; Eister *v.* Paul, 4 P. F. Smith 196. A chamber survey is good between warrantee and Commonwealth: Oyster *v.* Bellas, 2 Watts 397; Hole *v.* Rittenhouse, 1 Casey 492.

The opinion of the court was delivered, July 2d 1868, by

AGNEW, J.—The merits of this case will be better reached by discussing the questions arising in the course of the plaintiff's title, than by considering the numerous assignments of error. A brief statement of the title will enable this to be done more clearly. The plaintiff claimed under two warrants, dated February 11th 1794, in the names of Sarah Moore and Henry Miller, surveyed June 7th 1794 and returned September 3d 1794. The warrants were embraced in an application by James Nichol for twenty-six warrants, dated 11th February 1794. From entries made in Old Purchase Voucher, No. 12,457, and the Old Purchase Blotter, No. 12,457, it appears that the purchase-money of these twenty-six warrants was paid together in one sum by James Wilson, and from a connected draft certified from the surveyor-general's office it also appears that twenty-three of the warrants, including the Moore and Miller warrants, were surveyed together in one body, the remaining three being laid at a short distance and divided from the others by older surveys. On the 14th June

[Glass *v.* Gilbert.]

1794 Judge Wilson executed a mortgage to Charles Wolfstone-croft and others for a large body of lands, referring to certain articles of agreement and lists of lands annexed to them, and to fourteen receipts for money paid for warrants, recited as annexed to the mortgage, all for warrants issued and surveyed, or to be surveyed. These papers, which were necessary to identify the lands mortgaged, were not recorded with the mortgage, and seem to have been lost. A scire facias issued on this mortgage in 1829, at the suit of William Parker, assignee of the mortgagees, against Bird Wilson and John Adlum, surviving administrators of James Wilson, deceased. The sci. fa. and alias (both of which were returned nihil), contained no designation of the lands. Judgment was entered on motion on the 28th October 1829. On this judgment two writs of levari facias issued, containing no description of the land, but to the pluries writ issued to February Term 1831, a list of all the warrants issued on the 11th February 1794 was attached for the purpose of sale. This included the Moore and Miller warrants. William Parker became the purchaser of the lands under this writ, the sale being regularly returned by the sheriff, and a deed made to him regularly acknowledged October 25th 1831, and entered of record. William Parker by his will proved July 5th 1845, devised these lands to Richard P. Foulke and William P. Foulke, to whom Bird Wilson and Emily Hollingsworth, the heirs of James Wilson, released all their title by deed, dated 14th May 1847. The Foulkes, on the 13th November 1847, conveyed to a corporation called the "Preston Retreat" the undivided half of their title to the twenty-three warrants; and they and the Preston Retreat afterwards conveyed the whole to the plaintiff John Gilbert by deed of April 3d 1863.

The plaintiff gave in evidence another title not apparently connected with the former, beginning with a petition of Charles Witman, administrator of Wm. Witman, deceased, to the Orphans' Court for the sale for payment of debts, *inter alia,* of 23 tracts of land, describing them by the township, county, waters and adjoiners, so as to show that they were the same 23 tracts surveyed together including the Moore and Wilson warrants. A sale was made and confirmed in 1829 to Benjamin Coombe and Joseph Lyon, to whom the administrator of Witman conveyed on the 30th April 1833. By a deed of the same date Joseph Lyon released his interest to Benjamin Coombe. Coombe entered under his purchase on one of the tracts at the western end of the body, and built a saw-mill with some other improvements. He took timber from adjoining tracts, and had a survey made, including the Moore and Miller warrants. The Sarah Moore tract lies on the extreme easterly end of the body of surveys, and Henry Miller next adjoining on the west of the Sarah Moore survey. Excepting the Sarah Moore, and a small part of the Henry Mil-

[Glass *v.* Gilbert.]

ler surveys (making about 500 acres, for which this ejectment has been brought), the whole body of 23 tracts had been surveyed in the preceding spring under warrants of Robert Morris, now known as the Girard or City of Philadelphia lands.   The Moore and Miller tracts lay in Rush now Mahanoy township, and the remainder in what was formerly Barry township.   Eight hundred acres of land were assessed in Rush township to Benjamin Coombe as unseated in 1835, and sold by the treasurer for unpaid taxes in 1836 to Benjamin Coombe.   The evidence leaves but little doubt that these 800 acres were the Moore and Miller tracts; and the evidence objected to by the defendants as to the remainder of the lands lying in Barry township and the underlying Morris surveys, was offered to show that the unseated 800 acres in Rush township was that part of Coombe's ownership lying in the Moore and Miller surveys.   Coombe mortgaged the 23 tracts together in a body to Dr. Jonas Preston on the 4th June 1835.   On this mortgage proceedings were had resulting in a sheriff's sale and deed of the lands to the Preston Retreat in 1840.   The Preston Retreat united with the Foulkes in conveying, as before stated, to the plaintiff Gilbert, by deed of April 3d 1863.   From 1835 these lands appear to have been assessed to Benjamin Coombe and his assigns down to the bringing of this suit.   Two years after the deed of the Foulkes to the Preston Retreat for the undivided half of their claim under the Wilson title, to wit, beginning in 1850, the taxes were jointly assessed to the Foulkes and the Preston Retreat, showing that the parties held together by some arrangement both the Wilson and Coombe claims.

The defendants claim title under a warrant to Joseph Hoy, dated 24th May 1815, for 400 acres, surveyed June 9th, and patented to him July 8th 1815.   This survey was laid on the Sarah Moore and Henry Miller surveys, covering about an equal portion of each, and is well marked on the ground.   The title to this warrant and patent became vested in Alex. F. Glass.   There was evidence tending to show a possession taken under the title between 1835 and 1841.

In discussing the questions arising on the plaintiff's title, the first fact to be noticed is, that the defendants are strangers to the entire line of the plaintiff's title, their claim being wholly independent and resting exclusively on the Hoy title.

The first question in order is the right of Judge Wilson to the Moore and Wilson warrants.   It is argued by the plaintiffs in error, who were defendants below, that under the doctrine of Strimpfler *v.* Roberts, 6 Harris 283, and McBarron *v.* Glass, 6 Casey 133, to which is added Warner *v.* Henby, 12 Wright 187, a trust will not be sustained between the warrantee and one who has paid the purchase-money of the warrant, after twenty-one years have elapsed, without a possession taken by the claimant,

[Glass v. Gilbert.]

payment of taxes or other acts of notorious dominion exercised within the twenty-one years by the claimant. The court below sustained this position, and rested the case not on the ownership of the warrant by Judge Wilson, but upon the presumption of a conveyance by the warrantee to him, or to some one, arising from lapse of time. In this the learned judge erred in favor of the plaintiff in error.

The doctrine of Strimpfler v. Roberts, and McBarron v. Glass, is not to be doubted, but it applies to cases where the warrantee is himself a claimant of the title under his own warrant, and asserts his title; and in those cases he had actually obtained a patent. There it becomes a question of a mere resulting trust between claimants of the same title, and one alleging such a trust cannot lie by twenty-one years leaving the field to his antagonist without subjecting himself to the charge of laches and a dereliction of his rights. But in this case the question is wholly different. Sarah Moore and Henry Miller have never claimed or pretended to claim title to the warrants in their names; have never been heard of or known in the whole transaction, from the time of filing the application to this hour; and so far as we know from the evidence are mere names and not persons; though doubtless they were real persons whose names were used by Judge Wilson in taking out the warrants, according to the well known practice of the land office. No separate application was made by these persons in their own behalf, but their names come in company with twenty-four others in an application paid for together by Judge Wilson. This batch of warrants was located together, and clearly appears to belong to a single ownership and not to the individuals whose names were used. Under these circumstances the payment of the purchase-money was according to the ancient practice of the land office, affirmed by repeated decisions of this court for more than half a century, sufficient evidence of the ownership of the warrants by Judge Wilson: Cox v. Grant, 1 Yeates 166; Fogler v. Evig, 2 Id. 119; Galloway v. Ogle, 2 Binn. 468; Cluggage v. Duncan, 1 S. & R. 117; Campbell v. Galbreath, 1 Watts 73; Galbraith v. Detrich, 8 Watts 110; Turner v. Waterson, 4 W. & S. 171; Fox v. Lyon, 3 Casey 16; Brock v. Savage, 7 Id. 420. The patents to the Foulkes for the Moore and Miller tract, issued to them after the deed of the heirs of Judge Wilson to them, were a recognition of this long-continued usage of the land office, and a strong confirmation of the title of Wilson to the warrants. It is true that as to so much of the land as lay within the Hoy survey and patent, these patents may be said not to be regular, the state never designing to convey the same land twice, yet these patents were not void, for they contain a large portion of each survey not lying within the lines of the Hoy patent. Under these circumstances there was ample evidence of the ownership of the

[Glass *v.* Gilbert.]

warrants of Judge Wilson without resorting to the presumption of a conveyance from the warrantees; a presumption, however, not negatived by the proof, but entirely consistent with the facts of the case: Taylor *v.* Dougherty, 1 W. & S. 326–7; Turner *v.* Waterson, 4 W. & S. 174; Hastings *v.* Wagner, 7 Id. 216. In a question of the presumption of a grant it is not necessary that actual possession should always be in the presumptive grantee. Hastings *v.* Wagner, 7 W. & S. 216, 217, is a case where the land was in the actual possession of a claimant hostile to the title. The presumption grows out of the relations between the presumptive grantor and grantee, and not those of the adverse claimant. See also Fox *v.* Thompson, 7 Casey 172. The judge was therefore right in submitting to the jury the evidence of Judge Wilson's ownership of these warrants. We think he was right also in holding the evidence of the sale of Wilson's title under his mortgage to Wolfstonecroft to be sufficient to pass title *under the circumstances.* It is to be noticed on this point that the sale has remained ever since unquestioned by Wilson's heirs, while the defendants claim by a title entirely independent and adverse. The question does not arise between the heirs of Wilson or a grantee, mortgagee or judgment-creditor of Wilson, and the purchaser under the mortgage. The judgment was obtained against the administrators of Wilson, and a sale made thirty-six years before the trial, which has remained without objection. The judgment is not inquirable into in this action: Colley *v.* Latimer, 5 S. & R. 211; Allison *v.* Rankin, 7 Id. 269; Hauer's Appeal, 5 W. & S. 475. The pluries lev. fa. embraced a schedule of the tracts to be sold, and an actual sale of them was made to a bonâ fide purchaser, which was confirmed by the court in taking the acknowledgment of the sheriff's deed. The sale of the land contained in the schedule attached to the writ was therefore a judicial act, the writ being the process of the court and not of the party issuing it. The writ, though irregular, was not void. A levari facias, says Blackstone, is a writ "which affects a man's goods and the profits of his lands by commanding the sheriff to levy the plaintiff's debt on the lands and goods of of the defendant:" 3 Com. 417. In Pennsylvania it is the ordinary writ for collecting charges upon lands, as in the cases of mortgages, mechanics' claims, and municipal charges: Hart *v.* Homiller, Exr., 11 Harris 43. In Stouffer *v.* Commissioners, 1 Watts 300, it was said that a lien is a necessary and inseparable incident of a seizure in execution by the principles of the common law.

Property levied is in the custody of the law, the end of which might be prevented if creditors could subsequently acquire a paramount interest in it. It was therefore held that a treasurer's warrant to the sheriff to sell the lands of a delinquent collector of taxes created a lien by seizure which not only justified the sale,

[Glass *v*. Gilbert.]

but preserved the proceeds of sale against lien-creditors subsequent to the levy.    The same effect is given to a levy of land upon execution where the judgment has no lien : Packer's Appeal, 6 Barr 277; Hinds *v*. Scott, 1 Jones 25; Davis *v*. Ehrman, 8 Harris 259.

Though a levari facias differs from a fi. fa., and as a statutory writ given to enforce a mortgage will not like a fi. fa. give a new lien on lands not described in the mortgage, yet the writ being the process of the court and the sale the act of its officer, judicially affirmed by the acknowledgment of the deed, the length of time and acquiescence of the owners and their final release, afford a strong presumption that the land described in the writ and sold under it is the same referred to in the receipt once annexed to the mortgage and that which was actually mortgaged.

The description and sale in this case were, therefore, not an absolute nullity.    Having been acquiesced in by the owners many years, it does not now lie in the mouth of a stranger to impeach the sale.    This is fully settled by Riland *v*. Eckert, 11 Harris 220–221.    The defendants in that case claimed in opposition to the Wilson title, but insisted that the proceeding against the administrator of Wilson without notice to his heirs, under the 34th section of the Act of 1834, was void, and left the title outstanding in his heirs.    But this court held that the proceeding remaining unquestioned by the Wilsons for many years the defendants could not be heard to gainsay the sale.    See also Hastings *v*. Wagner, 7 W. & S. 217.    This case is stronger, for here not only had there been a non-claim by the heirs for thirty-five years, but they had actually released to the holders of the sheriff's title in 1847. Under all these proceedings the plaintiff, therefore, had a primâ facie title to the Moore and Miller warrants.

The next question relates to the right of the plaintiff to use the proceedings in the Orphans' Court, and the sale of the Witman estate in this body of warrants, as confirmatory of the Wilson title and as the ground of showing title under the treasurer's sale for taxes.    The statement of facts already made shows that the Witman claim, as vested in Benjamin Coombe, was not wholly irrelevant to the Wilson title.    Coombe bought the body of lands at that sale comprehending the twenty-three warrants, and entered on a part—making valuable improvements, surveyed the Moore and Miller warrants with the others, and he and those claiming under him, including the owners of the Wilson title after it became united with the Coombe title in the Foulkes and the Preston Retreat, paid the taxes for many years.    These acts tended inferentially to strengthen the Wilson title, inasmuch as this actual control of the lands by Coombe and his assigns was a challenge to any title on part of Sarah Moore and Henry Miller. As to them, if they had been actual owners of the warrants in

8 P. F. SMITH—19

[Glass v. Gilbert.]

their names, it was a matter of indifference who it was that challenged their title by taking possession and controlling their lands. Hence their total indifference and non-claim when their right was thus challenged, operated to strengthen the positive title of Wilson to the warrants, shown by his payment of the purchase-money, and the subsequent sale under the mortgage and the release of his heirs.

The relevancy of the evidence of the Coombe title to the sale of the 800 acres for taxes, was not denied if competent. But it was contended that this evidence in connection with the assessment in Rush and Barry township and the Moore survey, was incompetent because the identity of the land assessed and sold in the name of Coombe can be drawn only from the assessment itself, "which is the record that contains the description and fixes the duty." This citation of the language of the opinion in the City of Philadelphia v. Miller, 13 Wright 440, is a misuse of that case. We were there discussing a case where it was held that an assessment of a mere numerical quantity of land, without any circumstance of identity whatever, in the name of a person wholly unknown in connection with any claim or possession of the land, good or bad, would not support a treasurer's sale of a certain tract of land, which it was alleged was intended to be sold. The doctrine of that case, since affirmed and explained upon a second writ of error in the same case (6 P. F. Smith 488), is that the assessment itself, which is the record that states the land upon which the duty of paying the taxes is imposed, must contain some element, either of circumstance or name, which will lead to identification, otherwise, there is no possible means of performing or enforcing the duty of paying the taxes on part of the owner, the officer or the purchaser at the sale. This thought is repeated several times, and is finally summed up as the result of an extended examination of the authorities, in which, it is said, the assessment is void only when it *wholly fails to lead* to identification. But although there be no other element of description, yet if the *name* in which the assessment is made has become linked to the land by some known claim of title or possession, the cases cited and commented on in the opinion show that it is a source of identification and will support the assessment: Strauch v. Shoemaker, 1 W. & S. 166. In this case Benjamin Coombe's name became associated and connected with the land by his purchase of the Witman claim, and thus afforded a means of identifying the land assessed in his name as 800 acres in Rush township. The evidence, therefore, was competent for the purpose of identifying the land sold at treasurer's sale.

We have now reached the title of the defendants, and this brings us to the questions upon the surveys under the Moore and Miller warrants. All that the learned judge said upon the strong

[Glass v. Gilbert.]

presumption in favor of the regularity of these surveys, and that they were actually made upon the ground either by original or legally adopted lines, was very proper and necessary. In a trial at a distance of seventy years from the time of location, a survey twenty years older than the one that endeavors to supplant it, is entitled to every reasonable presumption in its favor. Slight evidence of marks found upon the ground corresponding with the survey returned ought to have great weight in repelling the charge of its being a mere chamber survey. Though the making of a single line in a quadrilateral or a polygon will not constitute a good survey, the evidence of one line corresponding to the location and time of survey, or the existence of an older line made in pursuance of authority, and shown by the return to have been adopted by the surveyor, is potent evidence of the fact of a survey actually made on the land. In recent locations where the monuments of the survey can be readily found, and the question of chamber survey easily solved, the absence of all evidence of the lines of survey is strong proof of the fact of a mere protraction of the lines on paper, where there are no natural boundaries corresponding to the survey. But when a long lapse of time, and the hand of man, may have obliterated these monuments, when death has removed the actors of that day from the scene, and when the evidence of a transaction so ancient must necessarily have ceased in a large measure to exist, slight circumstances should turn the scale in favor of the validity of the more ancient survey when the time intervening between them is so great, and the younger survey was made by a different hand. A chamber survey is not *ipso facto* a void act. If it be by the adoption of the lines of older surveys, made under authority of law, to the same extent that is necessary to make a good survey on the ground, it is as valid as though done by running and marking the lines afresh. The adoption of old lines legally made is as good as the making of new lines, the rule in such cases being not to re-mark. It is virtually a survey made on the ground, for the old lines are run and marked, and being done under some legal warrant or authority the means of ascertaining them is as easy as if they had been made under the warrant to which they are fitted. This was settled in Caul v. Spring, 2 Watts 390. Surveys of this kind are entitled to the same favorable presumptions as those for which original lines are made. And where some of the lines only have been made by adoption; after so great a lapse of time the fact of not finding the evidence of original work on the lines not made by adoption is not conclusive of the fact that they were not run. But if the fact be made to appear that the survey was fitted only to a single line of an older survey, leaving the other lines unmade in figures of four or more sides, and the survey is merely finished by protraction on paper, it is invalid against a junior survey made

within twenty-one years.   It is no better than the running of one line and then leaving the survey incomplete.   But if twenty-one years elapse before interference by a junior survey the presumption in favor of the first survey becomes absolute, even in the case of a chamber survey.   These principles may be found in the following cases :—As to what constitutes a good survey : Fugate *v.* Coxe, 4 S. & R. 294 ; Morris *v.* Travis, 7 Id. 220.   The adoption of old lines : McRhea *v.* Plummer, 1 Binn. 227 ; Covert *v.* Irwin, 3 S. & R. 283 ; Lamborne *v.* Hartswick, 13 S. & R. 113 ; Caul *v.* Spring, 2 Watts 390 ; Collins *v.* Barclay, 7 Barr 73.  The presumptions in favor of surveys made and returned : Fugate *v.* Coxe, *supra ;* Lamborne *v.* Hartswick, *supra ;* Mock *v.* Astley, 13 S. & R. 382 ; Norris *v.* Hamilton, 7 Watts 91.  Conclusiveness of the presumption after twenty-one years : Nieman *v.* Ward, 1 W. & S. 68 ; Collins *v.* Barclay, *supra ;* Norris *v.* Hamilton, *supra ;* McBarron *v.* Gilbert, 6 Wright 268.   Chamber surveys : Caul *v.* Spring, *supra ;* McBarron *v.* Gilbert, *supra.*

To prevent a misapplication of these remarks it is proper to add that no question of a block survey arose in the case, and the observations apply to surveys on separate warrants.   The warrants and surveys composing the batch of twenty-three surveyed together were not all given in evidence, and the court informed the jury in consequence that the principles relating to the location of a number of surveys belonging to one person in a single block did not apply to the case.   Undoubtedly in the case of surveys by blocks it is not necessary to show the running of the lines of each warrant.   It is sufficient if the entire body of warrants be surrounded by an exterior boundary as complete as would make a good survey if the entire body of land were contained in a single warrant : Morris *v.* Travis, 7 S. & R. 220 ; Stevens *v.* Hughes, 3 W. & S. 465 ; Collins *v.* Barclay, 7 Barr 72, 73.   In that case there might be but a single line marked for each tract, or if the tract were located in the interior, surrounded by the others on all sides, no side might be marked for it, and yet the survey would be good.   In separate surveys not in a block the case would be different.   The difficulty in this case arose from the fact which seemed to look out of the evidence, both from the returns of the surveys and the examinations on the ground ; that though the twenty-three warrants were located in one body, they appeared to have been laid by adopting the lines of older surveys on the south and east, and by protracting for the northern and western boundaries of the whole body.   This became, therefore, a question of fact for the jury, and if so found, the survey would have been doubtful even as a block survey, while as a separate survey of the Moore and Miller warrants, it left the former with but one line on the ground made by adoption of the western side of the Betz and Jones survey, and the latter without any line marked on the

[Glass v. Gilbert.]

ground. It was in view of this state of the evidence the defendants' 1st and 2d points were framed. The 1st point substantially called upon the court to say that if on all the evidence the jury found the Moore and Miller surveys to be mere chamber surveys, they were not valid, and that the adoption of the line of the older survey, as one boundary only of the Moore survey, would not help the plaintiffs' case. The answer of the court was a fair statement of the duty of the surveyor in making a survey which would lead a jury to understand what is necessary to constitute a good survey, yet it did not fully and directly meet the point. The defendants had a right to an answer whether such a survey as was described in the point was good or not. Instead of this, the general statement of the answer was rendered dubious and uncertain by the concluding portion in which the judge says, and " hence the surveyor was not expected to run and mark new lines."

The first impression made upon reading this portion of the answer was, that he meant that if the surveyor adopted the western side of the Betz and Jones survey for one line of the Moore survey, it was unnecessary that he should run and mark the other lines, which would be the new lines. It may be, however, that he meant that he was not expected to run and mark as new lines the lines of the Betz and Jones survey when adopted. But this want of clearness, taken in connection with the omission to give the direct instruction called for, certainly left the defendant's case uncovered in the very point most material to it. It was, indeed, the very pivot of the question of survey. The answer to the 2d point is liable to the same objection. As a statement of the law in support of the Betz and Jones surveys, the answer was very pertinent, and furnished good reasons why the jury should not conclude that they were chamber surveys. But the question here was not upon the title of Betz and Jones to the land returned as surveyed under their warrants, which probably on the facts presented (but which were for the jury) would be found to be good. The jury were properly instructed that, in considering the question whether the Betz and Jones surveys were made on the ground, the fact did not depend on one line alone, but on all that the surveyor did under those warrants. It might well be that no line could be found on the ground next to the Moore survey, and yet that a line there had been legally established, and could be shown by the work on the remainder of the surveys of Betz and Jones. Indeed, it might have been the closing line of those surveys, not actually marked on the ground from corner to corner, and yet a legal line of those surveys which could have been legally adopted. The corners being made, the closing line would run from corner to corner, the corners being marked on the ground and establishing a real line. But the real question in-

[Glass *v.* Gilbert.]

volved in the 2d point related to the Moore survey, and it was to this the attention of the court was called. It was upon the legal aspect of the case, if the jury found that the Moore survey was not executed by the adoption of an existing line made for another survey. If, at the time of the Moore survey, in 1794, the Betz and Jones surveys were mere chamber surveys, without lines on the ground to which the Moore survey could *then* attach, the 2d point asked the court to say that such a *then* non-existing line, a mere protraction on paper, was not one that could be adopted. Adopted lines must be real lines made under authority of law, in order to prevent the survey adopting them from being itself a chamber survey. But how can the adoption of the lines of a mere chamber survey redeem the second survey from the character of a chamber survey also? If *then* a chamber survey, and another had appropriated the land before time had cured it by a legal presumption, it is impossible to perceive how the presumption in favor of the Betz and Moore survey, subsequently arising, can relate back to the time of the location of the Moore survey, and change its character. Being made at a time when the Betz and Jones surveys had neither lines on the ground nor the presumption of law to establish them as such, there was nothing legally existing to be adopted. The Moore survey thus being a chamber survey, and the entry and survey for Hoy within the twenty-one years, the court was called on to say what was the legal effect, and this point the court did not fully and clearly respond to. In every other aspect the court seems to have met the case fully and tried it well. But as the question of chamber survey or not was the real point of controversy, the defendants were entitled to a full instruction on the effect, if the jury found the Betz and Jones surveys to be chamber locations when the Moore and Miller surveys were laid. The court was perfectly right in stating the presumptions in favor of these surveys as actual locations on the ground very strongly, in view of the facts and the lapse of time, but for the omission to answer the 1st and 2d points of the defendants fully and directly, so as to be properly understood, the judgment must be reversed.

Judgment reversed, and a *venire facias de novo* awarded.